**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:                                         )
                                               )         **Case No. 26-01207-5-JNC**
**THREE OAKS BEHAVIORAL**          )
**HEALTH & WELLNESS, PLLC**        )         **Chapter 11, Subchapter V**
                                               )
       **Debtor.**                           )

<u>**CREDITOR JACQUES A. EL-CHAYEB'S OBJECTION TO FIRST INTERIM ORDER
AUTHORIZING USE OF CASH COLLATERAL (DKT. 22) AND REQUEST FOR
CONDITIONS ON FINAL ORDER**</u>

Jacques A. El-Chayeb ("**Landlord**"), appearing *pro se* pursuant to **11 U.S.C. § 1109(b)**, as landlord and lessor of Debtor's leased commercial premises located at **4701 Creedmoor Road, Suite 101, Raleigh, North Carolina 27612** (the "**Premises**"), hereby files this objection to the First Interim Order Authorizing Debtor's Use of Cash Collateral (Docket Entry 22, entered March 19, 2026) (the "**First Interim Order**") and requests specific conditions on the final order at the hearing scheduled for **April 1, 2026 at 11:00 A.M. in the Raleigh Courtroom (3rd Floor)**.

Landlord respectfully requests that the Court rule on this Objection on the written papers submitted hereunder. In the event the Court requires a live appearance, Landlord respectfully requests the opportunity to appear by telephone or video conference, as Landlord is unable to appear in person due to personal and professional constraints. Landlord states as follows:

**I. INTRODUCTION**

Landlord is the individual owner and lessor of commercial premises **4701 Creedmoor Road, Suite 101, Raleigh, North Carolina 27612**. Debtor operates an outpatient psychotherapy practice serving Wake County from these Premises as part of a multi-location behavioral health practice.

The parties executed a Commercial Lease Agreement dated March 15, 2022 (the "**Lease**") with a term expiring **March 31, 2027** with option to renew. Lease Sections 3 and 4 establish monthly base rent subject to **4% annual escalation** on April 1st of each Lease Year—Year 4: $4,162.00 per month escalating to **$4,328.48 per month** starting April 1, 2026.

Debtor filed Voluntary Chapter 11 Subchapter V Petition (Docket Entry 1) (the "**Petition**") on March 16, 2026, and — that same day — filed Emergency Motion for Authorization to Use Cash Collateral (Docket Entry 5) (the "**Motion**"). Such Motion contained no operating budget, stating Debtor "will provide a budget specifying these expenses after discussing the budget with the Secured Parties" (Motion ¶ 10). On March 19, 2026, just three days later and without any participation by Landlord, the Court conducted a preliminary hearing on the Motion and entered the First Interim Order, providing a March 12-April 2 Budget attached thereto as Exhibit A (the "**Budget**").

**The First Interim Order and Budget are critically and materially deficient in ways that directly and irreparably harm Landlord**—for instance, and without limitation, the Budget:

- allocates a single figure of **$43,000** across all leases—absent a **per-location breakdown**, it is impossible to determine if Landlord's contractual rent is included at all (see *§ IV.C table)*;
- is **mathematically insufficient** to cover all lease obligations (about $65,549 per month based on Debtor's own Schedule disclosures) confirming that some landlords will not be paid;
- is annotated with: "**\*Debtor is assessing leases to be rejected**"—the **first and only disclosure** to Landlord of any intention to reject, provided without formal motion, identification of leases, or opportunity to be heard; and
- is **subject to a 10% downward variance** and amendment process requiring only Truist Bank's written consent — not Court approval — giving Truist de facto veto power over whether a mandatory statutory obligation is honored — an arrangement the Bankruptcy Code does not permit.

Under controlling Fourth Circuit precedent, **11 U.S.C. § 365(d)(3)** imposes an affirmative, continuing obligation — running from the order for relief — requiring the Debtor to perform all post-petition lease obligations at the **full contract rate**, independent of any § 503(b)(1) benefit analysis. *In re Midway Airlines Corp.*, 406 F.3d 229, 235 (4th Cir. 2005); *In re Eastern Agri-Systems Inc.,* 258 B.R. 352, 354–55 (Bankr. E.D.N.C. 2000) [hereinafter *E. Agri-Sys.*]. **While the *timing* of actual payment lies within the Court's discretion, that discretion is properly exercised now — at the cash collateral stage — by requiring a mandatory, non-variable, per-location rent line item in the final order.**

Once the estate's cash is consumed without rent protection—particularly in an estate that, by Debtor's own Petition, will have **no funds available for unsecured creditors** after administrative expenses—the § 365(d)(3) obligation becomes a hollow right that cannot be meaningfully enforced. Furthermore, Landlord asserts an independent right to adequate protection under 11 U.S.C. § 363(e) for its lease interest, which is directly affected by Debtor's use of Premises-generated cash collateral. *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 568 (3d Cir. 1994). **The time to protect Landlord is now, not after the money is gone and the Premises has been vacated or the lease rejected.**

## II. JURISDICTION AND STANDING

This Court has jurisdiction pursuant to **28 U.S.C. §§ 157(b)(2)(A), (G), 1334**. This is a core proceeding. Landlord qualifies as a party in interest under **11 U.S.C. § 1109(b)** as lessor of Debtor's unexpired nonresidential commercial lease identified on Schedule G (Contract No. 2.7) and has timely appeared via Docket Entry 28 (Notice of Appearance and Demand for Service of All Notices and Papers) before the final hearing scheduled for April 1, 2026, satisfying **Fed. R. Bankr. P. 4001(b)(2)**.

Landlord additionally has standing to seek adequate protection under **11 U.S.C. § 363(e)** as a party with an interest in property — specifically, its lease interest and possessory rights — that are affected by the Debtor's use of cash collateral generated from the Premises.

## III. FACTUAL BACKGROUND

This Section establishes four critical facts that render the $43,000 aggregate rent line item insufficient to protect Landlord's § 365(d)(3) rights: (1) material defects in Debtor's Petition disclosures; (2) acute administrative insolvency risk; (3) ambiguity in the Budget's lease rejection notation; and (4) five structural deficiencies in the Budget itself.

**A. Material Petition Disclosure Defects**

Landlord identifies the following material disclosure deficiencies in the Petition that require correction and that bear directly on this proceeding:

1. **Wrong Rent Rate**: Both Official Form 204 and Official Form 206E/F list Landlord's claim at **$4,001.92** — a figure corresponding precisely to the **Year 3 base rent** under the Lease, which was superseded by escalation on April 1, 2025 and had been expired for approximately **350 days** before the petition was filed. The applicable rate as of the petition date was $4,162.00/month (Year 4, operative since April 1, 2025), escalating to $4,328.48/month effective April 1, 2026. Using an expired rate understates the rent obligation by $160.08/month and misstates the applicable contractual rate to the Court.

2. **Official Form 206A/B, Part 9** ("Does the debtor own or lease any real property?"): Debtor checked **"No"** — despite Schedule G listing multiple unexpired commercial leases, including the Lease (Contract No. 2.7). This misrepresentation artificially understates the estate's nonresidential real property lease exposure.

3. **Official Forms 204 & 206E/F (Creditor Schedules):** Landlord's claim stated only at **$4,001.92**—reflecting only one month's rent without accounting for escalations, late charges, remaining contractual obligations through the **March 31, 2027** lease expiration, or other further details. Furthermore, post-petition rent obligations under **§ 365(d)(3)** are **§ 503(b) administrative obligations**, not pre-petition unsecured claims, and should not be classified as such.

4. **Official Form 204** (20 Largest Unsecured Creditors): Landlord's claim is listed at only **$4,001.92** — reflecting only one month's rent, without escalation, late charges, or the remaining contractual obligations under the Lease through March 31, 2027.

5. **Official Form 201, Item 13**: Debtor affirmatively represented that "After any administrative expenses are paid, no funds will be available to unsecured creditors." (Petition D.E.1; Official Form 201, Item 13) This admission is incorporated in the legal argument below as direct evidence of administrative insolvency risk.

**B. Debtor's Multi-Location Rent Arrears and Administrative Insolvency Risk**

Landlord is not the only lessor whom Debtor has failed to pay. Official Form 204 discloses pre-petition rent arrears to at least nine separate landlords at Debtor's multiple locations. Based on Debtor's own disclosures, the following approximate monthly rent obligations exist across all active leases: **~$65,549**

Against total assets of only **$424,587.64** and total liabilities of about **$3,045,036.60** — of which $937,000 is secured debt with collateral value listed as "Unknown" — the estate faces a structural deficit. Combined with Debtor's own admission that "no funds will be available to unsecured creditors" (Petition D.E.1; Official Form 201, Item 13) after administrative expenses, the aggregate § 365(d)(3) obligations across all active leases (approximately $65,549/month) create a compounding administrative burden the estate may be unable to satisfy. The cash collateral budget is Landlord's only viable mechanism for protection.

**C. Lease Rejection Assessment: Ambiguity and Its Legal Consequences**

The Exhibit A Budget annotation — "*Debtor is assessing leases to be rejected*" — constitutes disclosure by Debtor to Landlord of intention to reject the Lease. This notation raises immediate issues requiring resolution at the April 1 hearing. The Budget notation without any formal motion, identified lease, or timeline is wholly inadequate. Landlord is entitled to

immediate notice of whether its lease is among those targeted for rejection. A direction to Debtor to file a specific disclosure within seven days is warranted.

1. **The Assume-or-Reject Deadline:** Under **11 U.S.C. § 365(d)(4)**, a debtor-lessee in a Chapter 11 case must assume or reject a nonresidential real property lease by **the earlier of: (a) 120 days after the order for relief, or (b) the date of entry of a plan confirmation order.** The 120-day period from March 16, 2026 expires on **July 14, 2026**. The court may extend this period by 90 days (to October 12, 2026) for cause upon motion filed before expiration, but **any further extension beyond 210 days requires the lessor's written consent.** 11 U.S.C. § 365(d)(4)(B). Without formal court action by July 14, 2026, the Lease is **deemed rejected by operation of law** and Debtor must immediately surrender the Premises.

2. **§ 365(d)(3) Runs Until Formal Rejection:** The Debtor's "assessment" of whether to reject the Lease is not a legal event triggering rejection and does not relieve the Debtor of its § 365(d)(3) obligations. Until a formal rejection order is entered by this Court on proper motion and notice, **§ 365(d)(3) obligations continue to accrue in full at the contract rate on a monthly basis.** *In re E. Agri-Sys., Inc.*, 258 B.R. at 354. *See also In re Collins*, No. 18-02021-5-DMW, slip op. at 5-6 (Bankr. E.D.N.C. Jan. 06, 2019) (debtor's informal conduct and payment cannot substitute for formal § 365 assumption motion; § 365(d)(4) deadlines strictly enforced; lease deemed rejected by operation of law where debtor failed to formally assume within statutory period). The estate cannot "assess" whether to assume or reject while simultaneously relieving itself of the § 365(d)(3) performance obligation. Every month the Debtor occupies and uses the Premises while "assessing" rejection adds **$4,328.48** to the estate's administrative expense obligations. The projected post-petition § 365(d)(3) administrative expense accrual through the § 365(d)(4) deadline is: **~$17,170**. This is an administrative expense — accruing purely from the assessment delay.

   **§ 502(b)(6) Cap if Rejection Occurs:** Should the Debtor ultimately obtain a formal rejection order, Landlord's rejection damages claim will be subject to the § 502(b)(6) cap, currently estimated at approximately **$51,941.76** based on the remaining lease term.[1] Landlord expressly preserves all such rights without waiver, in addition to its § 503(b)(1)(A) administrative expense claim for post-petition rent, which is not subject to the § 502(b)(6) cap.

   Landlord preserves all rights to assert this capped rejection damages claim as an allowed unsecured claim **in addition to** its post-petition § 503(b) administrative expense claim (which is **not subject to the § 502(b)(6) cap**) and in addition to its pre-petition arrearage claim on file. *See* 11 U.S.C. § 502(b)(6) (cap applies to rejection damage claim, not to post-petition administrative obligations).

**D. The Budget—$43,000 Rent Line Item is facially deficient on five independent grounds**:

1. **Mathematical Insufficiency:** Based on Debtor's own Official Form 204, total monthly rent obligations across all active leases are approximately **$65,549 per month**. The $43,000 budgeted represents a shortfall of about **$22,549 per month**, confirming that the Debtor cannot and does not intend to pay all landlords in full under any interpretation of the current budget.

---

[1] Section 502(b)(6) caps rejection damages at the rent reserved for "the greater of 1 year, or 15 percent, not to exceed 3 years, of the remaining term of such lease." Remaining term: March 16, 2026 – March 31, 2027 ≈ 12.5 months. Option (a): 1 year × $4,328.48 = **$51,941.76**. Option (b): 15% × 12.5 months × $4,328.48 = 1.875 months × $4,328.48 = **$8,115.90**. Applicable cap = greater of the two = **$51,941.76**. This calculation uses the post-April 1, 2026 escalated rate; Landlord reserves the right to present a blended calculation if challenged.

2. **No Per-Location Allocation:** The $43,000 is a single undifferentiated sum. There is no breakdown by location, lease, or landlord. There is no disclosure of whether Landlord's $4,328.48 monthly obligation is included in the $43,000 or excluded. No creditor, no Subchapter V Trustee, and no Court can verify § 365(d)(3) compliance from this line item alone.

3. **"Assessing Leases to be Rejected" Notation:** This annotation is the first and only notice that Debtor has provided to Landlord of an intention to reject the Lease. It provides no timeline, no specification of which leases are targeted, no formal motion under § 365, and no opportunity for Landlord to be heard. The notation effectively converts the $43,000 into a **selective payment provision** — the Debtor may be budgeting rent only for leases it intends to retain, excluding Landlord's lease from payment entirely without any formal court process.

4. **Truist Consent Controls Budget Amendments:** Interim Order ¶ 3 provides that any expenditure exceeding 10% of a budgeted line item "shall require the **prior written consent of the Secured Parties** before being paid." Interim Order ¶ 5 further provides that budget amendments require Secured Parties' written approval, with any disputed amendment requiring a new motion on three business days' notice. This means that if Landlord's rent is excluded from the $43,000 allocation and Debtor seeks to include it, it cannot do so without Truist's written consent. This gives Truist — a competing creditor with no role in the § 365(d)(3) obligation — effective veto power over whether a mandatory statutory obligation is honored.

5. **Express § 506(c) Waiver:** Interim Order ¶ 14 expressly provides: "Nothing herein shall constitute...(iii) consent to any surcharge under § 506(c), all of which are expressly reserved." Truist has proactively shielded its collateral from any § 506(c) surcharge, making it even more critical that Landlord's § 365(d)(3) right be protected through an affirmative, mandatory budget line item — because both surcharge and equitable collateral recourse are now foreclosed.

## IV. LEGAL ARGUMENT

This Section demonstrates that: (A) § 365(d)(3) requires full contract-rate performance independent of § 503(b)(1); (B) administrative insolvency risk compels immediate budget protection; (C) the 60-day deferral limit expires no later than May 15, 2026; (D) the operating budget is structurally deficient under Fed. R. Bankr. P. 4001*;* (E) the operating budget is structurally deficient under Fed. R. Bankr. P. 4001; (F) Truist's budget consent mechanism cannot override a statutory mandate; and (G) Subchapter V plan confirmation requires full payment of § 365(d)(3) administrative claims — all converging on the need for, among other conditions, a specific, protected rent line item now.

**A. Section 365(d)(3): The Obligation Is Clear, Runs From the Order for Relief, and the Cash Collateral Budget Is the Mechanism to Honor It**

**11 U.S.C. § 365(d)(3)** provides: "the trustee shall timely perform all of the obligations of the debtor under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."

1. **The Controlling Fourth Circuit Framework:** Section 365(d)(3) imposes an affirmative, continuing obligation — running from the order for relief — requiring the Debtor to perform

all post-petition lease obligations in the ordinary course, **paying the full contract rent at the contract rate, exactly as it would be paid outside of bankruptcy.** *In re Midway Airlines Corp.*, 406 F.3d 229, 235 (4th Cir. 2005) ("[b]oth sections [365(d)(3) and (d)(10)] impose a duty of timely performance on debtors . . . notwithstanding section 503(b)(1)"); *In re E. Agri-Sys., Inc.*, 258 B.R. 352, 354–55 (Bankr. E.D.N.C. 2000) ("§§ 365(d)(3) and (10) elevate rent claims above § 503(b) by creating an entitlement, not just to payment, but to actual performance under the lease.").[2] The obligation is not contingent on estate benefit, is not reduced by a § 503(b)(1) actual-use analysis, and is not deferred by the mere act of filing.

2. Section 365(d)(3) imposes an affirmative, continuing obligation — running from the order for relief — requiring the Debtor to perform all post-petition lease obligations at the **full contract rent**, exactly as those obligations would be performed outside of bankruptcy. While *In re Midway Airlines Corp.*, 406 F.3d 229, 235 (4th Cir. 2005) arose primarily under the parallel § 365(d)(10), the Fourth Circuit applied identical reasoning to both provisions, which share the same statutory text and legislative history, including the operative "notwithstanding section 503(b)(1)" clause. *See also In re E. Agri-Sys., Inc.*, 258 B.R. 352, 354–55 (Bankr. E.D.N.C. 2000) (applying § 365(d)(3) performance obligation at contract rate to nonresidential real property lease directly). The obligation is not contingent on estate benefit and is not reduced by a § 503(b)(1) actual-use analysis.

Landlord further requests that the Court condition continued cash collateral use on adequate protection of Landlord's ongoing lease interest under 11 U.S.C. § 363(e), which independently requires the Court to prohibit or condition the Debtor's use of cash collateral if the Debtor cannot demonstrate that Landlord's interest in its lease is adequately protected. Given that the Premises generates all of Debtor's accounts receivable — constituting Truist's cash collateral — Landlord's interest is inseparably linked to the cash collateral itself.

3. **What the Fourth Circuit Framework Requires Here:** Landlord recognizes, consistent with *Midway Airlines*, that the § 365(d)(3) obligation is a § 503(b) administrative expense and shares *pro rata* with other allowed administrative claims — it does not carry super-priority over other § 503(b) claimants. Landlord does not contend otherwise. But this framework makes the cash collateral budget more critical, not less:

   • The § 365(d)(3) obligation is unambiguous and runs now; Post-petition rent is a § 503(b) administrative expense that **must be paid in full** before any distribution to unsecured creditors and before confirmation of any Subchapter V plan under § 1191(a) (incorporating § 1129(a)(9)(A));

   • The Debtor's own Petition concedes the estate will have no funds for unsecured creditors — meaning any administrative shortfall falls entirely on Landlord and other § 503(b) claimants; and

   • The cash collateral budget provides the mechanism for both § 365(d)(3) compliance and adequate protection of Landlord's lease interest under 11 U.S.C. § 363(e).

Without a specific, mandatory, non-variable rent line item for Landlord's Premises, Debtor uses Premises-generated collateral while the obligation accumulates — and disgorgement after the money is gone is no remedy at all.

---

[2] Noted above—both *Midway Airlines* and *E. Agri-Sys.* were decided primarily under § 365(d)(10) (personal property leases), but both courts expressly applied identical reasoning to § 365(d)(3) (nonresidential real property leases), as the statutory text and legislative history of both provisions are materially identical in all relevant respects. *See* 11 U.S.C. §§ 365(d)(3), (d)(10) (each containing identical "notwithstanding § 503(b)(1)" clause).

4. **The "Notwithstanding § 503(b)(1)" Language Is Not Accidental:** Both §§ 365(d)(3) and 365(d)(10) expressly provide that the duty to timely perform exists "**notwithstanding section 503(b)(1).**" Congress enacted § 365(d)(3) specifically *because* courts had previously required lessors to prove estate benefit before recovering post-petition rent. The "notwithstanding" clause eliminates that requirement. *E. Agri-Sys.*, 258 B.R. at 354. Neither the Debtor nor the Secured Parties may resist the rent obligation by arguing that the Premises generates insufficient value to justify full rent. And critically, as discussed in Section IV.E below, the Secured Parties cannot condition § 365(d)(3) performance on their budget consent. The administrative expenses enumerated in § 503(b) are not exhaustive. *In re Burival*, 613 F.3d 810, 812 (8th Cir. 2010). Section 365(d)(3)'s "notwithstanding § 503(b)(1)" clause therefore eliminates only the benefit-to-the-estate threshold of *§ 503(b)(1)(A)* — it does not remove the claim from § 503(b)'s general administrative expense framework. *In re Midway Airlines Corp.*, 406 F.3d at 237–38.

5. **The Budget's "Assessing Leases to be Rejected" Notation Cannot Suspend Performance:** The § 365(d)(3) obligation runs until the Court enters a formal rejection order on proper motion and notice. The budget notation — which is not a motion, not a pleading, and not an order — cannot substitute for formal rejection proceedings and cannot suspend the contractual and statutory obligation to perform in the interim. The burden of seeking modification rests entirely on the Debtor. "[I]t is the debtor who must persuade the court that based on the equities of the case that such rent should not be paid or reduced by some amount." *Giant Eagle, Inc. v. Phar-Mor, Inc.*, 528 F.3d 455, 460 (6th Cir. 2008) (applying § 365(d)(5); same "notwithstanding § 503(b)(1)" clause and identical burden-of-proof framework as § 365(d)(3); persuasive by analogy). The Debtor has made no such showing here — no motion, no equities argued, no formal invocation of the Court's modification authority. A budget footnote is not a motion.

6. **Landlord Is Independently Entitled to Adequate Protection Under 11 U.S.C. § 363(e):** Section 363(e) requires this Court to condition a debtor's use of property "as is necessary to provide adequate protection" to any entity with an interest in that property. Landlord holds a possessory leasehold interest in the Premises, which generates accounts receivable constituting Truist's cash collateral. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 568 (3d Cir. 1994) (en banc) (persuasive; leasehold interests affected by cash collateral use are cognizable under § 363(e)). Courts have recognized that parties with interests in real property from which cash collateral is generated hold protectable interests under § 363(e). Landlord's § 363(e) right is independent of, and cumulative with, its § 365(d)(3) right, providing an additional statutory basis for the specific rent line item requested hereunder.

## B. Administrative Insolvency Risk Compels Immediate Budget Protection

The case law is unanimous: § 365(d)(3) requires timely performance at contract rate. Courts split only on priority when administratively insolvent. Regardless of resolution, all roads lead to the same remedy here — immediate cash collateral protection. Courts mandating immediate payment without disgorgement (*In re Rich's Dep't Stores, Inc.*, 209 B.R. 810 (Bankr. D. Mass. 1997); *In re Pudgie's Dev. of N.Y., Inc.*, 239 B.R. 688, 694 (S.D.N.Y. 1999)) and courts rejecting superpriority alike (*In re Microvideo Learning Sys., Inc.*, 254 B.R. 90, 92-93 (Bankr. S.D.N.Y. 2000); *In re Pier 1 Imports Inc.*, 615 B.R. 196, 202 (Bankr. E.D. Va. 2020)) confirm that in cash-poor estates, § 365(d)(3) rights are protected at the cash collateral stage, not after funds are consumed.

This is the most acute practical issue before the Court. Landlord's § 365(d)(3) claim is an allowed administrative expense under § 503(b)(1)(A). Under Subchapter V, all allowed § 503(b) administrative expenses must be paid in full under a plan unless the holder agrees otherwise. *See* 11 U.S.C. § 1191(a) (incorporating § 1129(a)(9)(A)) (consensual plan); § 1191(e) (cramdown plan — administrative expense creditors must be paid in full absent consent). Recent Subchapter V authority confirms § 365(d)(3) rent cannot be deferred under § 1191(e). *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 346 n.10 (Bankr. S.D. Fla. 2020) ("unpaid administrative rent ... is not the type of administrative-expense claim that would qualify for [§ 1191(e)] treatment ... a debtor's obligation to pay post-petition rent is governed solely by Section 365, not by Section 503(b)"). **Landlord does not consent to deferred or reduced treatment of post-petition § 365(d)(3) obligations.**

Courts have confirmed § 365(d)(3) creates no superpriority — unpaid rent becomes a § 503(b) administrative claim sharing pro rata with other admins in an insolvent estate. *In re Pier 1 Imports Inc.,* 615 B.R. 196, 202 (Bankr. E.D. Va. 2020) ("Section 365(d)(3) does not provide a separate remedy to effect payment"). This confirms Landlord's position: even courts rejecting superpriority recognize the acute urgency of cash collateral protection in administratively insolvent estates. *In re Pudgie's Development of New York, Inc.*, 239 B.R. 688, 694 (S.D.N.Y. 1999) ("landlord is entitled to immediate payment under Section 365(d)(3) and court may not order disgorgement of payments, but when estate is administratively insolvent, unpaid rent does not have super-priority status").

Debtor's own Petition affirmatively states: "After any administrative expenses are paid, **no funds will be available to unsecured creditors.**" (Petition D.E.1; Official Form 201, Item 13) Combined with Debtor's own disclosures — summarized below — the estate faces substantial risk of administrative insolvency:

| Category | Amount |
|---|---|
| Total Assets | $424,587.64 |
| Total Liabilities | $3,045,036.60 |
| Secured Claims | $937,000 (collateral value "Unknown") |
| Merchant Cash Advances | >$1.5 million |
| BCBS Settlement | $567,090 |
| Pre-petition Rent Arrears (9 landlords) | >$65,000 |
| Monthly § 365(d)(3) Obligations | ~$65,549 |
| Starting Cash | $6,308.86 |

With $6,308.86 in cash against ~$65,549 in monthly rent alone, cash collateral consumption without rent protection leaves § 503(b) claimants — including Landlord — sharing a shrinking pool pro rata. The cash collateral budget is the *only* mechanism to protect Landlord from this outcome. Reserving a specific, non-variable rent line item now does not harm the estate; it preserves the estate's compliance with an obligation that exists independent of the budget. Refusing to reserve rent now creates a forward-building administrative obligation that may overwhelm the estate's capacity entirely.

## C. The 60-Day Outer Limit: Any Cause-Based Deferral Expires No Later Than May 15, 2026

Section 365(d)(3) provides: "The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, **but the time**

**for performance shall not be extended beyond such 60-day period.**" 11 U.S.C. § 365(d)(3). The order for relief was entered March 16, 2026. The absolute outer limit for any permissible court-ordered deferral of obligations arising in the first 60 days is therefore **May 15, 2026**. This means:

**There is no automatic grace period.** Any deferral requires the Debtor to show *cause* at a hearing; it is not granted by the mere act of filing. **April 1, 2026 rent** (arising within the 60-day window) may, upon a proper showing of cause, be deferred — but *only* through **May 15, 2026** at the absolute latest; **May 1, 2026 rent** (also arising within the window) may similarly be deferred but only through **May 15, 2026**. **Any obligation arising after May 15, 2026** must be performed when due, with no court discretion to extend, regardless of plan status or estate condition. A debtor "cannot remain idle after the sixty-day grace period, neither seeking modification of nor fulfilling his obligations under the lease, and then ask for a retroactive modification of his obligations when the lessor seeks an administrative expense." *In re The Elder-Beerman Stores Corp.*, 201 B.R. 759, 764 (Bankr. S.D. Ohio 1996) (persuasive authority on § 365(d)(3) 60-day provision).

In the Fourth Circuit, any equitable modification of § 365(d)(3) obligations operates prospectively only. "The equitable modification provision does not allow a court to make an equitable adjustment of the amount recoverable as an administrative expense when the debtor in possession fails to perform as required; rather, it only allows a court to modify the debtor in possession's actual performance." *In re Midway Airlines Corp.*, 406 F.3d at 240. There is no retroactive modification once the obligation has accrued. *Id.* Other courts are similarly "reluctant" to grant retroactive relief, permitting it only in extraordinary circumstances not present here. *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 485 (Bankr. D. Del. 2006). The April 1 final hearing must address this timeline. If the Debtor seeks cause-based deferral of April or May 2026 rent, it must make that showing now, and any approved deferral must be structured to reserve deferred amounts from cash collateral for payment no later than May 15, 2026.

**D. Operating Budget Is Structurally Deficient Under Fed. R. Bankr. P. 4001**

**Fed. R. Bankr. P. 4001(b)(1)(B)** requires a cash collateral motion to include "a brief introductory statement...describing...the purposes for the use of the cash collateral." Even with Exhibit A now on file, the budget remains deficient in ways that preclude meaningful creditor or Court review:

- **No per-location rent allocation:** The $43,000 aggregate figure cannot be evaluated for § 365(d)(3) compliance without knowing which landlords receive what amounts;
- **Income projections are unverified:** $506,500 in projected income for an approximately 18-day period — primarily $376,900 in insurance collections — is unsubstantiated by any patient census data, collection rate history, or payer mix analysis;
- **Starting cash of $6,308.86 provides no cushion** for budget shortfalls; if income projections miss by even a modest percentage, the estate cannot meet its obligations; and
- **The 10% variance provision applies to all line items** and requires only Truist's consent — not Court approval — for budget amendments, effectively privatizing plan administration to Truist's discretion.

Landlord requests a final order conditioning continued cash collateral use on provision of a supplemental budget disclosure addressing each of these deficiencies, with Landlord's rent identified as a specific, non-variable, Court-confirmed line item.

**E. Truist's Budget Consent Mechanism Cannot Override a Statutory Mandate**

Interim Order ¶ 3 provides that any expenditure exceeding 10% of a budgeted line item "shall require the **prior written consent of the Secured Parties** before being paid." Interim Order ¶ 5 provides that budget amendments require Secured Parties' written approval, and that if a Secured Party declines, the Debtor must file a new motion on three business days' notice.
This consent mechanism is structurally incompatible with § 365(d)(3) obligations in two independent respects:

1. **§ 365(d)(3) Is Non-Negotiable:** Section 365(d)(3) is a congressionally mandated performance obligation. It cannot be subjected to a secured creditor's consent right. Truist's consent is relevant to how the Debtor manages its pledged collateral within the cash collateral framework; it is not relevant to whether the Debtor must comply with a statutory obligation to a third-party landlord. Allowing Truist to effectively veto Landlord's § 365(d)(3) payment — by refusing to consent to a budget amendment that includes Landlord's specific rent allocation — would subordinate a statutory duty to a contractual arrangement between the Debtor and its secured lender. No authority supports this result.

2. **The Aggregate Rent Line Creates a Procedural Irregularity that Bypasses the Bankruptcy Code's Notice Requirements:** The aggregate $43,000 rent line item, combined with the "assessing leases to be rejected" notation and Truist's budget consent requirement, creates a mechanism by which the Debtor and its secured lender can jointly determine — outside any court process and without notice or hearing — which landlords receive statutory § 365(d)(3) payments and which do not. This informal, extra-judicial prioritization is not authorized by the Code. Under 11 U.S.C. § 363(c) and applicable procedural rules, the allocation of cash collateral among competing creditors with statutory rights requires court authorization, not private consent. *See* 11 U.S.C. § 363(c)(2); *In re Colad Group, Inc.*, 324 B.R. 208, 215 (Bankr. W.D.N.Y. 2005).

Truist's proactive § 506(c) reservation under Interim Order ¶ 14 eliminates the only alternative remedial avenue — meaning that the cash collateral budget's failure to include a specific, protected rent line item leaves Landlord with a statutory obligation that is unenforceable in practice. This is precisely the outcome § 365(d)(3)'s "notwithstanding § 503(b)(1)" language was designed to prevent. *In re E. Agri-Sys., Inc.*, 258 B.R. at 354–55.

The final order must specify that the § 365(d)(3) rent obligation for **Landlord's Lease specifically** — $4,328.48/month effective April 1, 2026 — is a **mandatory, non-variable, Court-approved line item**, expressly excluded from the Truist consent mechanism in Interim Order ¶¶ 3 and 5.


**F. Subchapter V Plan Confirmation Requires Full Payment of § 365(d)(3) Administrative Claims**

Landlord's § 365(d)(3) post-petition rent obligation is an allowed administrative expense under § 503(b)(1)(A). Under Subchapter V:

- For a **consensual plan** under § 1191(a), all requirements of § 1129(a)(1)–(16) must be satisfied, including **§ 1129(a)(9)(A)**, which requires that holders of allowed § 503(b) administrative claims receive cash equal to the full allowed amount on the plan effective date, unless the holder agrees otherwise;

- For a **cramdown plan** under § 1191(b), the plan must be "fair and equitable" as to each non-consenting impaired class, and **§ 1191(e)** requires that administrative expense creditors be paid in full under the plan absent their consent; and

- Plan **feasibility** under **§ 1129(a)(11)** (incorporated by § 1191(a)) requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor."

On the numbers presented by Debtor's own schedules — total liabilities of $3,045,036.60 against assets of $424,587.64, secured claims of $937,000, and an estate that by Debtor's admission will have no funds for unsecured creditors after administrative expenses — any plan confirmation analysis must account for the monthly post-petition rent of $4,328.48/month accruing through the earlier of the lease term or formal rejection. Failure to reserve and pay this obligation from cash collateral during the pendency of the case makes plan feasibility increasingly difficult to demonstrate and ultimately impossible if the estate is administratively insolvent at confirmation.

**Landlord does not consent** to deferred payment, reduced payment, or plan treatment of post-petition § 365(d)(3) rent obligations. All such rights are expressly reserved.

## V. REQUESTED RELIEF

Landlord respectfully requests that this Court:

**1. MODIFY THE FIRST INTERIM ORDER** (Docket Entry 22) to: (a) add Landlord to the service list for all further hearings, orders, and filings in this case; (b) reserve Landlord's objections for full consideration at the April 1, 2026 final hearing; and (c) clarify that nothing in the Interim Order limits, modifies, or affects Landlord's rights or remedies under the Lease or applicable law; and (d) direct that any further interim cash collateral authorization entered prior to the final order be subject to the same conditions requested hereunder.

**2. ENTER A FINAL CASH COLLATERAL ORDER** that conditions continued cash collateral use on the following (provided as adequate protection of Landlord's lease interest under 11 U.S.C. § 363(e), in addition to § 365(d)(3) compliance):

- **Specific Rent Line Item.** Monthly post-petition rent for Landlord's Premises (4701 Creedmoor Road, Suite 101, Raleigh, NC 27612) is reserved from cash collateral at the full contract rate — $4,162.00 through March 31, 2026; $4,328.48 effective April 1, 2026 — as a **fixed, Court-identified** line item expressly excluded from the Truist variance and consent mechanism in Interim Order ¶¶ 3 and 5. This specific line item is required for compliance with Fed. R. Bankr. P. 4001(b)(1)(B);
- **60-Day Transition.** If the Debtor seeks cause-based deferral of April or May 2026 rent, Debtor must make an affirmative showing of cause at the April 1 hearing; any Court-approved deferral must be reserved in the DIP account and paid in full no later than **May 15, 2026** — the absolute outer limit under 11 U.S.C. § 365(d)(3). All § 365(d)(3) obligations arising after May 15, 2026 must be performed when due without any court-ordered deferral (contract rate per § I above);
- **Schedule Corrections.** Debtor shall file corrected schedules within seven (7) days of the final order: (i) amending Official Form 206A/B (Part 9) to accurately disclose all leased nonresidential real property; and (ii) correcting Landlord's claim in Official Form 206E/F and Form 204 to reflect the actual contract rent of $4,162.00/month (Year 4, effective April 1, 2025), escalating to $4,328.48/month effective April 1, 2026; and
- **Per-Location Budget Disclosure.** Debtor shall file a supplemental budget disclosure within seven (7) days of the final order identifying, for each active lease: (a) the landlord; (b) the monthly contractual rent; (c) whether the lease is included in the $43,000 budget

line at the full contractual rate; and (d) whether the lease is under active rejection assessment.

**3. DENY** Debtor's request for 10% variance authority as applied to Landlord's specific rent line item. Such variance authority may apply only to non-mandatory, discretionary operating expenses and may not be used to reduce obligations fixed by statute (§ 365(d)(3)) and contract.

**4. CLARIFY THE LEGAL EFFECT OF THE REJECTION NOTATION** by noting for the record that: (a) the budget's "*Debtor is assessing leases to be rejected*" notation does not constitute a formal motion, a rejection, or any legal event under 11 U.S.C. § 365; (b) § 365(d)(3) obligations continue to accrue and must be performed at the full contract rate until a formal rejection order is entered by this Court on proper motion and with proper notice and opportunity to be heard; and (c) the notation does not suspend, reduce, or excuse § 365(d)(3) performance during any assessment period. Landlord reserves all rights to object to any formal rejection motion and to assert that the notation constitutes a constructive election to retain the Lease for § 365(d)(3) purposes pending formal court action.

**5. RESERVE ALL LANDLORD RIGHTS**, including without limitation:

- The right to seek relief from the automatic stay under 11 U.S.C. § 362(d) if post-petition rent obligations are not timely performed at the contract rate — nothing in the final order shall be construed as a waiver of or limitation on this right;
- The right to assert a fully allowed § 502(b)(6) rejection damages claim (estimated at approximately $51,941.76 based on the remaining lease term through March 31, 2027) as an allowed unsecured claim, **in addition to** Landlord's § 503(b)(1)(A) administrative expense claim for all post-petition rent accruing from March 16, 2026 through the formal rejection date, which is not subject to the § 502(b)(6) cap;
- All rights under the Lease's default and remedy provisions as against all parties bound thereby;
- The right to object to any proposed Subchapter V plan that does not provide for full cash payment of Landlord's allowed § 503(b)(1)(A) administrative expense claim at or before the plan effective date; and
- The right to enforce the § 365(d)(4) deemed-rejection provision if Debtor fails to formally assume or reject the Lease by **July 14, 2026**.

## VI. CONCLUSION

The Bankruptcy Code imposes a clear, non-negotiable, contract-rate duty on this Debtor to pay post-petition rent under § 365(d)(3), running from the order for relief and confirmed by both the Fourth Circuit and this Court's own precedent. *In re Midway Airlines Corp.*, 406 F.3d 229, 235 (4th Cir. 2005); *In re E. Agri-Sys., Inc.*, 258 B.R. 352, 354–55 (Bankr. E.D.N.C. 2000). The newly received Budget— received by Landlord only on or around March 26, 2026, seven days after entry of the Interim Order and after the budgeted period was already running — reveals that the Interim Order's rent structure is not merely insufficient: it is structurally incompatible with § 365(d)(3).

A single $43,000 aggregate rent line item for nine landlords, annotated with an unspecified rejection intention, subject to a Truist consent mechanism, and mathematically insufficient to cover all active lease obligations by at least $22,549 per month, does not constitute "timely performance" of any specific landlord's § 365(d)(3) rights. It creates a mechanism — operated by the Debtor and its secured lender without court involvement, notice, or hearing — for informal,

extra-judicial prioritization of which § 365(d)(3) obligations will be honored and which will be silently disregarded. The Bankruptcy Code does not permit this result.

The remedy Landlord seeks is not extraordinary. It is a **specific, identified, non-variable budget line item** — a reserved allocation from the cash collateral generated by the very Premises at issue — ensuring that a statutory obligation honored in every performing tenancy is honored here as well. The alternative is an administrative insolvency spiral in which Premises-generated collateral is consumed by operational expenses and secured creditor replacement liens while Landlord holds a § 365(d)(3) obligation that, in an insolvent estate, cannot be enforced. Congress did not enact § 365(d)(3)'s "notwithstanding § 503(b)(1)" mandate to produce that result.

Landlord further reserves all rights and remedies available under the Lease and applicable law against all parties bound thereby.

Landlord respectfully requests that the Court grant this Objection and impose the conditions set forth herein as prerequisites to final approval of Debtor's use of cash collateral.

PRAYER FOR RELIEF
Landlord requests the Court:
1. SUSTAIN this Objection to final cash collateral order;
2. CONDITION final order on § 365(d)(3) rent payments at $4,328.48/month (non-variable);
3. MODIFY Interim Order to reserve rent line item;
4. Grant such other relief as just and proper.

**Dated: March 28, 2026**


/s/ Jacques A. El-Chayeb
**Jacques A. El-Chayeb**
Creditor/Landlord/Lessor, Pro Se
3622 Shannon Rd Suite 104
Durham, NC 27707


---

**CERTIFICATE OF SERVICE**
I certify that on March 28, 2026, I served this Objection via U.S. Mail upon:
- Debtor's Counsel (Carpenter/Hendren/Grow/Waller), Hendren Redwine & Malone PLLC, 4600 Marriott Drive Suite 150, Raleigh, NC 27612
- George M. Oliver, III, Chapter 11 Subchapter V Trustee, The Law Offices of Oliver & Cheek, PLLC, PO Box 1548, New Bern, NC 28563
- Bankruptcy Administrator, 434 Fayetteville Street Mall, Suite 640, Raleigh, NC 27601
- Truist Bank, c/o Eudora F.S. Arthur and James S. Livermon III, 555 Fayetteville St, Ste 1100, Raleigh, NC 27601

**Submitted electronically via EDDS**

/s/ Jacques A. El-Chayeb