**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No. 26-01207-5-JNC** |
| **THREE OAKS BEHAVIORAL** | ) | |
| **HEALTH & WELLNESS, PLLC,** | ) | **Chapter 11** |
| | ) | **(Subchapter V)** |
| **Debtor.** | ) | |

**TRUIST BANK'S OBJECTION TO CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION DATED AUGUST 12, 2026 [D.E. 151]**

Truist Bank objects to confirmation of the Debtor's Plan of Reorganization (the "Plan") filed on August 12, 2026 (D.E. 151), under 11 U.S.C. §§ 1191 and 1129 and Fed. R. Bankr. P. 3020(b). In support of its objection, Truist shows the Court as follows:

## INTRODUCTION

Truist holds a first-priority lien on all of the Debtor's operating assets, and the Plan treats that lien as fully securing Truist's claim. Even so, the Plan denies Truist the return the Bankruptcy Code requires for a fully secured creditor. It freezes Truist's claim at its proof-of-claim amount of $500,064.90, then stretches repayment over six years at a fixed 6.4% rate that sits below the 7.00% prime rate *Till* treats as the starting point for a cramdown rate. Truist has rejected the Plan, so the Debtor must satisfy § 1191(b). As to Truist's class, the Plan fails that standard as follows:

1. The Plan fails to account for § 506(b). The Plan would erase the interest, fees, and costs that accrue between the petition date and the Effective Date.
2. The rate is too low. A fixed rate below prime, for six years, cannot deliver present value under § 1129(b)(2)(A)(i)(II).
3. The term exceeds the projections. The Debtor projects only three years of operations, and its Year 1 cushion of $5,238.35 is smaller than a single monthly payment to Truist.
4. The Plan would discharge liens before Truist is paid, enjoin enforcement, and leave Truist without the "appropriate remedies" § 1191(c)(3)(B) requires.

## BACKGROUND

Truist extended the Debtor a $500,000.00 revolving line of credit, evidenced by a Promissory Note dated November 18, 2024. (Ex. A.) A Commercial Security Agreement of the same date secures the Note. (Ex. B.) It grants Truist a lien on all inventory, equipment, accounts (expressly including all health-care-insurance receivables), deposit accounts, money, general intangibles, and goodwill, together with their proceeds. (*Id.*) Truist perfected its lien that same day by filing UCC-1 Financing Statement No. 20240138049E with the North Carolina Secretary of State. (Ex. C.) Every other financing statement the Plan identifies was filed later: Kapitus on March 27, 2025, CSC on November 14, 2025, Parkview on February 2, 2026, CT Corporation on February 17, 2026, and Lendero on March 11, 2026. (D.E. 151 at 15–17.) Casie Lorraine Hall, the Debtor's sole member, guaranteed the debt. (Ex. F.)

The Note carries interest at the one-month Term SOFR reference rate plus a margin of "2.650 percentage points over the Index," computed on a 365/360 basis. (Exs. A, D, E.) Commencing a bankruptcy case is an event of default. (*Id.*) The Note also provides: "Upon default, including failure to pay upon final maturity, the interest rate on this loan shall be increased by adding an additional 4.000 percentage point margin." (Exs. D, E.) And the Debtor agreed to pay Truist's reasonable attorneys' fees and legal expenses, expressly including "expenses for bankruptcy proceedings." (Exs. A, D, E.)

The parties extended maturity twice. A Change in Terms Agreement dated November 4, 2025 extended it to January 18, 2026, and a second Change in Terms Agreement dated January 9, 2026 extended it to April 18, 2026. (Exs. D, E.) The Debtor did not reach that date. In the weeks before filing, it entered into a merchant cash advance with Parkview on January 14, 2026 and a "Future Receivables Sale and Purchase Agreement" with Lendero on February 17, 2026. (D.E. 151 at 15–16.)

Four days before the Petition Date, the Debtor drew $30,000.00 on the Note and wired those funds to Debtor's counsel to pay the attorney's retainer for filing this Chapter 11 case. And then on the Petition Date, the Debtor drew another $185,000.00 on the Note to fully advance the available credit under the Note. It filed this case moments after Truist advanced those funds to the Debtor. A month later, the line matured unpaid.

Truist filed Claim No. 10 on June 18, 2026, asserting a secured claim of $500,064.90. The payoff as of October 7, 2026, exclusive of the legal fees incurred in this proceeding, is $486,555.20, with interest continuing to accrue at the non-default contractual per diem rate of $85.34.

The Plan places Truist alone in Class 2 and treats its claim as a secured obligation of the Debtor in the amount of $500,064.90. The Debtor would amortize that figure over six years at a fixed 6.4%, in monthly payments of about $8,382.27 beginning January 15, 2027. Before then, it would pay $5,000.00 per month as "interest only" from September 10 through December 10, 2026.

The Debtor supports a six-year obligation to Truist with three years of projections. Those projections show net income of $5,238.35 in Year 1 on income of $8,086,720.00, followed by $9,740.14 in Year 2 and $14,603.61 in Year 3. And they assume revenue growth despite the business has shrunk from ten locations at the Petition Date to five today.

**OBJECTION**

Without Class 2's acceptance, the Debtor cannot obtain confirmation under § 1191(a). It must instead satisfy § 1191(b), which requires that the Plan meet every applicable requirement of § 1129(a) other than paragraphs (8), (10), and (15), and that it be fair and equitable as to Class 2. For a secured class, fair and equitable means "the plan meets the requirements of section 1129(b)(2)(A)." 11 U.S.C. § 1191(c)(1). Under the deferred-payment option the Debtor chose, Truist must retain its liens "to the extent of the allowed amount of such claims," §

1129(b)(2)(A)(i)(I), and must receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property," § 1129(b)(2)(A)(i)(II). Section 1191(c)(3) adds a feasibility component, and § 1129(a)(11) applies independently. The Plan fails each requirement, beginning with the amount of the claim.

**I. The Plan understates Truist's allowed claim because it disregards the interest, fees, and costs § 506(b) guarantees to a fully secured creditor.**

**A. Truist is entitled to post-petition interest, fees, and costs because its collateral, valued in light of the Debtor's proposed use, exceeds its claim.**

When collateral is worth more than the claim it secures, "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b). The interest component carries no conditions. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("Recovery of post-petition interest is unqualified.").

The Plan's own terms establishes that Truist is oversecured. The Debtor treats Truist's full $500,064.90 claim as secured, then strips every junior lienholder because nothing is left "after senior security interests." Collateral value turns on "the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). Here the Debtor proposes to keep every item of Truist's collateral and with it, projects to generate $8,086,720.00 in Year 1 alone.

**B. The Plan's definitions and its general bar on post-petition interest would erase those amounts.**

Several provisions work together to fix Truist's claim at the petition-date figure. The Class 2 treatment sets the secured claim at $500,064.90. (D.E. 151 at 15.) The definition of "Claim" provides: "If a conflict arises between a filed claim and the treatment of the claim set forth in the Plan, the treatment set forth in the Plan shall control." (*Id.* at 9.) The definition of "Allowed"

reaches "the treatment of a claim as set forth in the Plan." (*Id.*) And Article VIII.G states that "no interest, penalty, or late charge shall be allowed on any claim subsequent to the Petition Date, unless otherwise required by the Bankruptcy Code." (*Id.* at 19.) Article XVI.A acknowledges that a creditor may apply for § 506(b) fees, yet nothing in the Plan adds an allowed § 506(b) amount to the Class 2 claim or provides for paying it. Nor does the Plan say how the four $5,000.00 pre-Effective Date payments will be applied.

A plan that pays less than the allowed claim cannot satisfy § 1129(b)(2)(A)(i)(II). Truist's allowed claim includes prepetition principal and interest, post-petition interest through the Effective Date, and reasonable fees, costs, and charges under the loan documents, with any adequate protection payments credited as the loan documents provide.

**II. A fixed rate of 6.4% for six years does not give Truist the present value of its claim.**

Section 1129(b)(2)(A)(i)(II) requires that deferred payments have a present value, as of the Effective Date, equal to the allowed secured claim. In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the plurality addressed the parallel Chapter 13 provision, anticipated that bankruptcy courts would follow essentially the same approach under the Code's other present-value provisions, and listed § 1129(b)(2)(A)(i)(II) among them. *Id.* at 474 & n.10 (plurality opinion); *see In re Renegade Holdings, Inc.*, 429 B.R. 502, 524–25 (Bankr. M.D.N.C. 2010) (applying the *Till* formula to the § 1129(b)(2)(B)(i) present-value requirement in a Chapter 11 case). The *Till* formula begins with the national prime rate and adjusts upward because a bankrupt borrower is riskier than a creditworthy commercial borrower. The size of that adjustment depends on "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479 (plurality opinion).

**A. The proposed rate starts below the floor *Till* built on.**

The prime rate has been 7.00% since September 17, 2026, up from 6.75% on the Petition Date. The Plan's 6.4% sits below the current prime rate and even below the prime rate on the Petition Date, pricing a Subchapter V debtor emerging from default as a better credit risk than a bank's most creditworthy commercial customer. No upward adjustment can rescue a rate that begins below its own starting point. And because the rate is fixed, the Plan shifts six years of interest-rate risk to Truist at a time when the prime rate has already begun to rise.

**B. Every *Till* factor calls for a substantial risk premium.**

*Circumstances of the estate.* The Debtor's business is contracting. It has closed five of its ten locations since the Petition Date. Before filing, it sold future receivables to merchant cash advance lenders, a financing source used by businesses that cannot borrow conventionally. It fully drew down all available credit on the Note on the Petition Date ($185,000) and even financed its bankruptcy attorney's retainer to file this case with the Truist line of credit.

*Nature of the security.* Truist's collateral consists of receivables, deposit accounts, and goodwill. That collateral turns over continuously, and its value depends entirely on the Debtor's continued operation. If not continuously replaced, its value diminishes on a dollar-for-dollar basis. Unlike real property, it has little value if the business falters.

*Duration.* The Plan converts a matured revolving line of credit into a 72-month term loan at a fixed rate, two years longer than the Debtor's own projections reach.

*Feasibility.* As Part III explains, the projected margin for error is close to zero.

**C. The rate should be no less than prime plus 3.00%.**

These factors place this case at the top of the range of adjustments *Till* described. Any cramdown rate should be no less than 10.00%, which is prime plus 3.00%, and should be reset if the Effective Date moves.

**III. The six-year term exceeds the Debtor's projections, and the Plan is not feasible as to Truist.**

Section 1129(a)(11) applies through § 1191(b) and requires a finding that confirmation is not likely to be followed by liquidation or further reorganization. Section 1191(c)(3) separately requires either that the Debtor will be able to make all plan payments, or that it is reasonably likely to do so and the Plan provides "appropriate remedies" if it does not.

The Debtor offers three years of projections to support a seven-year plan term and a six-year obligation to Truist. Years 4 through 6, which carry 36 of Truist's 72 payments, have no support at all. The projected years leave almost nothing to spare. Year 1 net income of $5,238.35 on $8,086,720.00 in revenue is a margin of 0.06%, smaller than one $8,382.27 monthly payment to Truist. The projections assume revenue growth of 3% in Year 2 and 4% in Year 3 even as locations close, and they omit the Subchapter V trustee's compensation. A plan that a single missed collection cycle would push into default is not feasible, and its term should not exceed the period the Debtor's evidence can support.

**IV. The Plan's lien, discharge, and remedy provisions do not protect Truist.**

**A. Truist must retain its liens until its claim is paid in full.**

Section 1129(b)(2)(A)(i)(I) requires lien retention to the extent of the allowed claim, and Class 2 repeats that requirement. But Article XV.B provides that, upon a § 1192 discharge after five years of payments, plan distributions satisfy and release all "liens on the Debtor's property, whether known or unknown." Because Truist's payments run through Year 6, that provision

would release its lien before it is paid. It also overreaches under § 1192, which does not discharge debts on which the last payment falls due after the first three years of the plan, or such later time not exceeding five years as the Court fixes. The Plan itself is inconsistent on that point: Form 425A refers to three years, and the Addendum to five. The Plan should state expressly that Truist's liens survive confirmation and any discharge until Class 2 is paid in full, and that Truist's claim is not discharged before then.

**B. The Plan gives Truist no appropriate remedy on default.**

Article X.C conditions any enforcement action on a 30-day notice and cure opportunity, with no limit on the number of cures. If a default goes uncured, Article VIII.B leaves the remedy with the Debtor, which "shall commence an orderly liquidation of its assets within six (6) months." Meanwhile, Article XIV.B permanently enjoins every holder from enforcing any encumbrance or setoff. For a lender secured by receivables and cash, six (6) months of debtor-controlled liquidation is not a remedy. It is a period during which the collateral dissipates. The Plan should provide that the loan documents remain in effect except as expressly modified, that the injunction terminates as to Truist and its collateral without further order if a payment default is not cured within ten (10) days after written notice, and that Truist may then exercise its rights under the loan documents and applicable law.

**C. The Debtor cannot preserve a § 506(c) surcharge or an open-ended right to challenge Truist's claim.**

Article IX.C preserves the Debtor's right to recover the costs of preserving collateral after confirmation, and Article VIII.J allows the Debtor to challenge secured creditors' claims "relating to the payoff and/or satisfaction of their Secured Claims at any time." Truist is entitled to know the amount of its allowed claim when the Plan is confirmed. Both provisions should be stricken as to Truist, or limited to objections filed before the confirmation hearing.

**RESERVATION OF RIGHTS**

Truist reserves the right to supplement this objection, to present evidence on valuation, the cramdown rate, and feasibility at the confirmation hearing, to object to any amended or modified plan, and to seek relief from the automatic stay.

WHEREFORE, Truist requests that the Court deny confirmation of the Plan and grant such other and further relief as the Court deems just and proper.

Dated: October 7, 2026

**WOMBLE BOND DICKINSON (US) LLP**

By: /s/ *James S. Livermon, III*
JAMES S. LIVERMON, III
N.C. State Bar No. 26492
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-2148
Email: charlie.livermon@wbd-us.com

*Counsel for Truist Bank*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing Truist Bank's Objection to Confirmation of Debtor's Plan of Reorganization Dated August 12, 2026, with its exhibits, through the Court's CM/ECF system on the following parties:

Three Oaks Behavioral Health & Wellness, PLLC
Attn: Officer/Manager
1011 Dresser Court
Raleigh, NC 27609
*Debtor*

Jason L. Hendren
Rebecca Redwine Grow
Benjamin E.F.B. Waller
Lydia C. Carpenter
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
*Counsel for the Debtor*

George M. Oliver, Esq.
*Subchapter V Trustee*

Brian Behr, Esq.
*Bankruptcy Administrator*

Dated: October 7, 2026

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ James S. Livermon, III*
JAMES S. LIVERMON, III
N.C. State Bar No. 26492
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-2148
Email: charlie.livermon@wbd-us.com

*Counsel for Truist Bank*